Filed 3/27/14  P. v. Williams CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HORATIO VAN-ELLIS WILLIAMS,<br><br>    Defendant and Appellant. | A133987<br><br>(Contra Costa County<br>Super. Ct. No. 5-111060-0) |
| In re HORATIO VAN-ELLIS WILLIAMS,<br><br>    on Habeas Corpus. | A136466 |

Horatio Van-Ellis Williams (appellant) appeals from a judgment entered after a jury found him guilty of vehicular manslaughter with gross negligence (Pen. Code, § 192, subd. (c)(1)[1]), reckless driving with great bodily injury and a prior conviction (Veh. Code, § 23104, subd. (b)), and reckless driving with specific injury (Veh. Code, § 23103, subd. (a)).  He contends the trial court erred in allowing evidence of two prior arrests and one prior conviction for reckless driving to come into evidence.  Appellant has also filed a petition for a writ of habeas corpus in which he contends his appointed counsel was ineffective because she failed to investigate and pursue a misidentification defense and made only an ineffectual effort in trying to keep out evidence of his prior acts.  We reject the contentions and affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

An information was filed July 15, 2011, charging appellant with: (1) vehicular manslaughter with gross negligence (§ 192, subd. (c)(1), count 1); (2) leaving the scene of an accident involving a fatality or permanent serious injury (Veh. Code, § 20001, subds. (a), (b)(2), count 2); (3) reckless driving with great bodily injury and prior conviction (Veh. Code, § 23104, subd. (b), count 3); and (4) reckless driving with specific injury (Veh. Code, § 23103, subd. (a), count 4). The information further alleged as to the vehicular manslaughter charge that appellant fled the scene of the crime (Veh. Code, § 20001, subd. (c)), and lastly alleged that appellant had served two prior prison terms (§ 667.5, subd. (b)) on convictions that left him ineligible for probation (§ 1203, subd. (e)(4)).

On September 21, 2011, the trial court granted appellant's motion to bifurcate the prior conviction allegations, but not as to the prior conviction element of the vehicular manslaughter with gross negligence charge. After a jury trial, the jury returned its verdict finding appellant guilty of vehicular manslaughter with gross negligence (count 1), reckless driving with great bodily injury and a prior conviction (count 3); and reckless driving with specific injury (count 4). The jury acquitted appellant of the charge that he fled the scene of an accident (count 2) and found not true the enhancement allegation that he fled the scene of an accident. The trial court granted the prosecution's motion to dismiss one of the prior prison term allegations and granted the defense motion to dismiss the other. Appellant waived jury trial on the prior conviction probation ineligibility allegation, and after a bench trial the court found the allegation true. On October 28, 2011, the trial court sentenced appellant to six years in prison.

### *The Incident*

The information was based on an incident that occurred on March 24, 2010. That day, Jeremy Watkins was driving eastbound on Highway 80, traveling in a Ford van from his workplace in Berkeley to his home in Martinez. At about 3:50 p.m., a black BMW with tinted windows caught Watkins's attention. Traffic was fairly heavy at the time but "was moving" "[b]etween 55 to 65 miles per hour." From his rear and side-view mirrors,

Watkins saw the BMW making erratic lane changes and driving at an excessive speed. As Watkins drove in the number 2 lane (of four) near the Central Avenue merge on Highway 80, he saw the black BMW "flash" behind him and enter the number 1 lane to Watkins's left. The BMW tailgated the car in front of it before passing by Watkins, and then proceeded "swiftly" and "very erratically" from the number 1 lane to the number 3 lane. There, the BMW briefly tailgated the vehicle in front of it, before making another "erratic" lane change and moving into the number 4 lane. There were several cars ahead of the BMW in lane number 4 at that point.

From 30 to 40 feet away, or perhaps closer, Watkins kept watching the BMW because he "was afraid for what this vehicle was going to do next." Within seconds, the BMW pulled onto the shoulder of the highway—to the right of the number 4 lane—and accelerated and passed the car it had been tailgating. This all occurred before the Central Avenue merge point. While driving 55 to 60 m.p.h. himself, Watkins saw the BMW cut back into the number 4 lane, perhaps as close to a foot in front of the car that was in that lane. The BMW braked because it had a car in front of it: "There was nowhere for him to go." The car behind the BMW braked too, and as Watkins testified: "You could see the forward momentum of the vehicle. He had both hands on the wheel. And came within inches, as far as I could tell, of the black BMW, still at a high rate of speed. And the vehicle behind the black BMW turned his wheel while braking and went into a sideways slide. . . . It folded around a light pole. . . . There was dust. I just remember seeing the vehicle just collapse around the light pole."

Burl Hall also witnessed the collision. He was driving on Highway 80 and it appeared as if the black car (he did not know the make of the car) entered the freeway from the Central Avenue onramp. The black car was traveling at a speed higher than 60 m.p.h., and cut very closely in front of a smaller car. Hall watched the smaller car swerve to avoid hitting the black car. The smaller car avoided the black car but spun out of control and smashed into a light pole, driver's side first. The light pole was just after the Central Avenue onramp.

3

The smaller car was a green Acura Integra. Herrick Hernandez was a passenger in the Acura, and the driver was one of his best friends, 21-year-old Genesis Polo. They were traveling to either Walnut Creek or the Sun Valley Mall in Concord, and Polo's friend Anhthu Huynh and two of her friends were in the car behind Polo and Hernandez. Huynh testified they were traveling at a little over 65 m.p.h. when a black BMW with tinted windows cut in front of her from the left without use of a turn signal. The BMW came very close to the front of Huynh's car and the back of Polo's and proceeded to pass Polo on the right hand shoulder of the highway before cutting back into the number 4 lane, right in front of Polo. The driver of the BMW did not use his turn signal when he cut in front of Polo, and Huynh saw Polo hit his brakes. According to Huynh, Polo immediately "swerved all the way to the right into the pole." Hernandez recalled that as he and Polo approached the Central Avenue merge point on Highway 80 a black BMW 7-Series vehicle sped past them on the right hand shoulder of the highway. Hernandez was paying attention to his cell phone at that time but recalled the BMW eventually re-entered the highway, in front of the Acura, and that Hernandez felt the Acura "jerk to the left," as if Polo was trying to avoid a collision. The Acura then began to slide, and ultimately crashed into a light pole, with the driver's side of the Acura hitting the pole first. The BMW did not stop when the Acura collided with the pole.

Watkins followed the BMW after the Acura collided into the pole. He got close enough to see the BMW's license plate, and using a marker he had in his vehicle, wrote it down on his dash as he drove. He also unsuccessfully attempted to take a photo of the BMW with his cell phone camera. Watkins also called 9-1-1 while still on Highway 80. Watkins told the operator about the "ugly" scene he had witnessed, and said the "black BMW" had caused the accident that left the other car "folded in half." Watkins gave the operator the BMW's license plate number as 4WJK348. Referring to the 4 "[i]n the end [in 348]," he told the operator, "I'm not 100% positive on the 4. But I'm 90% sure." The BMW eventually left Highway 80 at the Potrero exit, and Watkins told the 9-1-1 operator that too. The BMW made an illegal lane change to take that exit.

Hall also followed the black car as it changed lanes numerous times. Hall never got closer than three car lengths away. He was able to write down only the following regarding the black car's license plate number: 4WK. Meanwhile, back at the crash scene, Hernandez could not get out of the Acura and some Good Samaritans were trying unsuccessfully to open the passenger's side door. Hernandez had a broken hand and pain in his left shoulder. Polo was on top of Hernandez and was neither awake nor moving. Eventually law enforcement and medical authorities arrived at the scene and after Hernandez was removed from the car, he was transported to a hospital by helicopter. Unfortunately, Polo was dead. He had numerous external and internal injuries and died as a result of blunt force trauma.

A few days after the incident, California Highway Patrol (CHP) Officer Roberto Barrera was provided the license plate number 4WJK348, and using the Department of Motor Vehicles (DMV) database, attempted to learn the registered owner of the vehicle with that plate number. Barrera ran 12 to 15 variations of the 4WJK348 number through the data base, and ultimately learned that appellant was the registered owner of a BMW with the license plate number 4WKJ348. The registered owner of the vehicle 4WJK348—the number Watkins had provided the operator—lived in Southern California and his car was a silver Honda. CHP Officer John Zatezalo traveled to appellant's residence in Point Richmond and left his business card on the front door. Appellant contacted Zatezalo and they arranged to meet at the Oakland CHP Offices on May 14, 2010.

Appellant came to the meeting in a black BMW 7-Series four door sedan. Zatezalo asked appellant about March 24, 2010, and appellant said he had worked at the Eden Medical Center in Castro Valley that day. He said he was a plumbing contractor and normally finished work at 3:30 p.m. Appellant said that given the time he normally finished work, it would have been hard for him to have been at the stretch of Highway 80 where the accident occurred at the time it happened, 3:50 p.m. The distance from the Eden Medical Center to the location of the Polo fatality was approximately 22 miles. Appellant repeatedly said he was unaware of any accident occurring on Highway 80 at

Central Avenue, and that he had not contributed to any accident or hit or collided with another car. Zatezalo told appellant that witnesses placed his car at the scene at the time of the crash, and appellant replied that "if his vehicle was there, then he was driving it." According to Zatezalo, appellant "stated that based upon the information I gave him, that if his vehicle was there, it was 100 percent positive that he was driving the vehicle at that time and that location, of the day." Appellant "stated that he does not allow anyone to drive his vehicle."

The plumbing foreman at Eden Medical Center testified that appellant worked at the Eden Medical Center on March 24, 2010, from 7:00 a.m. to 3:20 p.m. The Eden Medical Center was about a mile and a half from Highway 580, which connects with Highway 80.

### The Prior Offenses

On December 5, 2004, Oakland Police Officer Andrew Trenev was monitoring traffic leaving the Oakland Alameda County Coliseum after a Raiders football game and at around 4:45 p.m. made a traffic stop of appellant. During the course of that traffic stop Trenev formally arrested appellant for reckless driving and impounded his vehicle. Appellant was later charged and convicted as a result of this incident.

On July 4, 2009, at shortly after 2:00 a.m. Albany Police Officer Chris Beck conducted a traffic stop of appellant. Appellant was driving a black BMW 7-Series sedan with the license plate number 4WKJ348. During the course of this traffic stop Beck conducted a custodial arrest of appellant for reckless driving.

On August 29, 2009, approximately 12:55 a.m., Albany Police Officer William Boehm conducted a traffic stop of appellant. During the course of this traffic stop Boehm formally arrested appellant for reckless driving and impounded his black BMW, license plate number 4WKJ348.

### DISCUSSION

### Appeal

Appellant contends the trial court erred in allowing evidence of his two prior arrests and one prior conviction for reckless driving to come into evidence. We disagree.

6

With exceptions, Evidence Code section 1101, subdivision (a), provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence Code section 1101, subdivision (b), provides that evidence of an act committed by a person is admissible when it is relevant to prove knowledge and is not used to show his general disposition.

We review the trial court's ruling permitting admission of prior acts under Evidence Code section 1101, subdivision (b), pursuant to the abuse of discretion standard. (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 117.) A trial court's exercise of discretion "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

In *People v. Ochoa* (1993) 6 Cal.4th 1199, 1204–1205, the defendant was charged with gross vehicular manslaughter while intoxicated, and the trial court allowed the admission of evidence at trial that the defendant had suffered a prior conviction for driving under the influence and had attended an alcohol awareness class. The California Supreme Court held the trial court did not abuse its discretion in admitting the evidence. (*Id.* at p. 1206.) The court stated: "In determining whether a reasonable person in defendant's position would have been aware of the risks, the jury should be given relevant facts as to what defendant knew, including his actual awareness of those risks. . . . [F]or if the evidence showed that the defendant actually appreciated the risks involved in a given enterprise, and nonetheless proceeded with it, a finding of gross negligence (as opposed to simple negligence) would be appropriate whether or not a reasonable person in defendant's position would have recognized the risk." (*Id.* at p. 1205.) The Supreme Court stated that "the evidence at issue here was relevant to defendant's awareness of the risk, and was admissible on that basis." (*Id.* at pp. 1205–1206.)

7

In *People v. Ortiz*, *supra*, 109 Cal.App.4th 104, 109, the defendant caused a vehicular homicide that resulted in a jury convicting him of second degree murder. The evidence established that defendant had driven at excessive speeds and crossed a double yellow line to pass other vehicles. (*Id*. at pp. 106–107.) At one point, he crossed the double yellow line and collided head on with a car, killing two others. (*Ibid*.) The prosecution and defense stipulated the defendant was not intoxicated at the time of the collision, but the trial court admitted evidence of the defendant's prior drunk driving conviction over defense counsel's relevancy and Evidence Code section 352 objections. (*Id.* at pp. 111–112.)

The Court of Appeal affirmed the trial court's ruling admitting the prior convictions evidence, holding the evidence was probative to the question of intent, i.e., the subjective knowledge necessary for implied malice. (*People v. Ortiz*, *supra*, 109 Cal.App.4th at pp. 114–115.) Noting that evidence of prior instances of reckless driving on the question of intent are regularly admitted, the court stated, "A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving—whether intoxication, rage, or wilful irresponsibility—the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior." (*Id.* at p. 115.)

Here, the trial court ruled it would allow the prosecution to present evidence of appellant's prior acts of reckless driving "for purposes of showing prior knowledge and awareness of the risks and dangers of reckless driving." The court stated, "I am going to allow the People to use that. I do find that the information contained in the arrests and the penalty that he suffered by being arrested and having the car impounded does give him a substantial knowledge as to the risk of that charge. And the charge was indicated as reckless driving. He was convicted of one and arrested for the other two. [¶] Thus, I will allow the People to present evidence of those three circumstances in their case in chief, . . ." At the end of the case, the court instructed the jury: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for

that purpose and for no other. During the trial, evidence of Mr. Williams' prior arrests was admitted for a limited purpose. You may consider evidence of Mr. Williams' 2005 conviction for reckless driving for the limited purpose of determining if the elements of the offense alleged in Count 3, reckless driving with prior conviction, have been proven. You may also consider the 2004 arrest and resulting 2005 conviction of reckless driving and the two 2009 arrests for reckless driving in deciding whether the People have proven that Mr. Williams was aware of the risk that reckless driving poses to others. Do not consider these arrests or the conviction for any other purpose. You may not use the prior arrests to establish that Mr. Williams drove recklessly in this case. You also may not use the prior arrest or conviction to establish that Mr. Williams has the propensity to drive recklessly."

We find no abuse of discretion. The prosecution had the burden of proving as to the vehicular manslaughter with gross negligence charge that appellant, among other things, was aware, or should have been aware, that the way in which he drove on March 24, 2010, "could create a high risk of death or great bodily injury." At issue in this case, therefore, was whether appellant was aware of the high risk of death or great bodily injury he created by the way he drove that day. His prior acts, which led to two arrests and one conviction for reckless driving, were probative on that issue.

Appellant attempts to distinguish *Ochoa* and *Ortiz* by saying that in those cases, the defendants' prior acts had probative value because they resulted in convictions, and because the defendants in those cases had attended "educational program[s] designed to impress upon [them] the dangers of driving [under the influence]." He asserts his conviction for reckless driving had no relevance to the issue of knowledge because he had not caused an accident or injury, and he had not attended an educational program that would have taught him about the dangers of driving recklessly. As for his arrests, he argues that it "simply makes no sense at all" that an arrest or acquittal on a reckless driving charge would lead him to better understand the risk that his driving "could create a high risk of death or great bodily injury." He states, "People are stopped and cited by

the police every day," and that "[w]hat one learns from getting such a ticket is that you'll have to pay a fine."

We disagree. First, as to his conviction, it was reasonable for the trial court to determine that a person convicted of reckless driving, with or without an accompanying accident or injury or mandatory class time, would have a heightened understanding that the act of driving recklessly constitutes a criminal offense because of the risks it creates. (See *People v. Ortiz*, *supra*, 109 Ca1.App.4th at p. 115 [a jury is "entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving—the driver's subsequent apprehension and prosecution for that conduct must impart a knowledge and understanding of the personal and social consequences of such behavior"].) Second, as to the arrests, no court has required that only prior reckless driving accompanied by a *conviction* is admissible on the question of whether the defendant drove in the charged case with awareness of the risks of reckless driving. Citations or arrests that flow from reckless driving "do not take place in a vacuum." (*Id.* at pp. 112–113.) Here, appellant was arrested twice for reckless driving in 2009 after having already been convicted of it in 2005. On both 2009 occasions his car was impounded. Based on these facts, the trial court could reasonably determine the arrests were relevant on the question of whether, during appellant's alleged criminal driving in 2010, he had the knowledge that reckless driving created a high risk of death or great bodily injury. At best, appellant's argument shows that reasonable minds may differ on the question of whether arrests for reckless driving, without more, gives the arrestee knowledge that if he drives the same way in the future, that conduct would create a high risk of death or great bodily injury. Where, as here, "the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

Appellant next asserts that even if his prior conduct was relevant to show knowledge, the evidence should not have been admitted because it was more prejudicial

10

than probative under Evidence Code section 352. Evidence Code section 352 provides in relevant part that trial courts, in their discretion, "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice."

We find no reason to disturb the trial court's determination that the admission of the prior acts evidence was not unduly prejudicial. "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.) Here, the prejudicial impact of appellant's prior acts was less inflammatory than his conduct during the charged offenses. (See *People v. Ewoldt* (1994) 7 Cal.4th 380 [potential for prejudice decreased as jury's passions were not likely inflamed by evidence of the defendant's less serious uncharged conduct].) The fact that the jury was presented with evidence that appellant was convicted of only one of the three prior acts also lessened the prejudicial impact of those acts. Further, the trial court properly admonished the jury regarding the limited purpose for which the prior acts were introduced, thereby eliminating the chance a jury would punish appellant simply because he had committed the prior acts. The trial court did not exceed the bounds of reason in allowing the prosecution to introduce evidence of appellant's prior acts.[2]

---

[2]Appellant also argues that "[e]vidence of prior bad acts . . . should properly be viewed under standards governing constitutional due process violations" because an " 'abuse of discretion' " standard[] is too lenient." We reject the argument. (See, e.g., *People v. Carter* (2005) 36 Cal.4th 1114, 1147 [a trial court's Evidence Code section 1101, subdivision (b), ruling is reviewed for abuse of discretion].) Appellant has not cited any authority that would lead us to conclude that evidentiary rulings regarding prior bad acts should be reviewed under a stricter standard.

*Petition*

Appellant contends his trial counsel was ineffective because she failed to investigate and pursue a misidentification defense and made only an ineffectual effort in trying to keep out evidence of his prior arrests.

A criminal defendant is entitled to representation sufficiently competent under professional norms so as not to deny the defendant a proceeding with a reliable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–696.) A finding of ineffective assistance of counsel is warranted only if the defendant establishes: (1) performance by counsel was deficient under the objective standards of reasonable attorney performance; and (2) prejudice. (*Ibid.*) In evaluating allegations of deficiency, our scrutiny of the challenged actions or omissions of counsel is highly deferential. (*Id.* at p. 689.) This means we must indulge in a strong presumption that counsel's conduct fell "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Ibid.*) "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Ibid.*)

"Prejudice" from unreasonable performance by counsel occurs only where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) Where, as here, a claim of trial counsel ineffectiveness is made via petition for writ of habeas corpus, each party may go outside the appellate record and give trial counsel an opportunity to discuss the charge of ineffectiveness. (*Ibid.*) The petitioner "bears a heavy burden" to both initially plead and later prove sufficient grounds for habeas relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) Vague or conclusory factual and legal assertions are insufficient to merit relief. (*Ibid.*)

12

Appellant first contends that his trial counsel failed to adequately investigate the case. Specifically, he faults counsel for not investigating whether his 2002 BMW "had been misidentified as the 'black car' responsible for the accident based on coincidental similarities to the plate numbers reported by witnesses despite his protestations of innocence and request for investigation." Appellant acknowledges the CHP officer ran about 12 to 15 variations of the number 4WJK348 in determining that appellant was the registered owner of a BMW with the license plate number 4WKJ348. He states, however, that counsel should have requested a search of the *entire* DMV database to identify the names and addresses of *all* owners of *all* 7-Series BMWs with license plates starting with either 4WJ and 4WK. He cites to various statistical evidence and asserts that such a search could have revealed there were "at least 70 BMW 7-Series sedans which were issued California license plates starting with either 4WJ or 4WK."

We conclude that even if counsel performed deficiently in not requesting such a search, appellant's claim fails because he did not show he was prejudiced by the deficient performance. As noted, witness Jeremy Watkins saw a black BMW with tinted windows driving erratically on Highway 80. He wrote down the car's license plate as 4WJK348, and another witness was able to catch the first three symbols, 4WK. Appellant's place of employment was only 22 miles away from the scene of the accident and five minutes from Highway 580, which connects with Highway 80. There was testimony that appellant left work that day in time to place him at the scene at the time of the accident. Appellant told an officer that if his car was at the scene, he was "100 percent positive that he was driving the vehicle at that time and that location of the day." Appellant also told the officer that he did not let others drive his car. In light of the fact that the description of the car that the two witnesses provided—including the car's license plate number—so closely matched that of appellant's car, and that there was other ample evidence placing appellant at the scene, there was no reasonable probability the jury would have had a reasonable doubt regarding appellant's identification even if it had been presented with the above statistical evidence.

13

We also reject appellant's assertion that counsel's performance was deficient because she made an ineffectual effort in trying to keep out evidence of his prior arrests. Appellant faults counsel for failing to file a written opposition and says counsel was "unprepared to address that issue" at the hearing on the motion. The record shows, however, that counsel argued against the admission of the prior acts of reckless driving on the grounds that the authorities upon which the prosecution was relying were distinguishable, that the proffered evidence was more prejudicial than probative under Evidence Code section 352, and that two of the prior acts of reckless driving by appellant did not even end in conviction. We do not believe that her statements at the hearing provide any support for appellant's position that her performance was deficient.

Appellant also faults counsel for failing to inform the jury—once the prior acts evidence was admitted—that one of the acts ended in a jury acquittal of the charge, and that the other act did not go to trial because the charge was dropped. Counsel, however, argued to the jury that "the fact that [appellant] was *arrested* and his car was impounded has very little value in terms of establishing that he knew there was an extreme risk posed to other people." (Italics added.) Even assuming that counsel was ineffective in failing to specifically state that appellant was acquitted of one of the charges, we would conclude that appellant cannot show prejudice, i.e., that there was a reasonable probability the jury would have found a lack of knowledge on the part of appellant regarding the dangers of reckless driving had it been specifically told that two of the prior acts did not result in a conviction. Appellant has failed to establish that he was provided with ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

14

_____
McGuiness, P.J.

We concur:


_____
Jenkins, J.


_____
Pollak, J.